**Affirmed in Part, Reversed and Remanded in Part, and Majority and Dissenting Opinions filed March 9, 2023.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00361-CV

## IN THE INTEREST OF A.Y.C., A CHILD

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2020-02304J**

## MAJORITY OPINION

D.C. ("Mother") and H.G.G. ("Father") appeal the trial court's Final Decree for Termination of their parental rights to their son A.Y.C. ("Adam").[1] Mother contends in four issues that (1) the evidence is legally and factually insufficient to support termination of her parental rights pursuant to Texas Family Code section 161.001(b)(1) (D) and (E); (2) the evidence is legally and factually insufficient to support the trial court's finding that termination of Mother's parental rights is in the

---

[1] We use pseudonyms or initials to refer to the child and parents involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

child's best interest; and (3) the trial court abused its discretion when it appointed the Department of Family and Protective Services (the "Department") as the sole managing conservator of the child. Father contends in five issues that (1) the trial court lacked jurisdiction "to sign a decree terminating the parental rights of" Father; (2) the evidence is legally and factually insufficient to support termination of his parental rights pursuant to Texas Family Code section 161.001(b)(1) (D), (E), (N), and (O); and (3) the evidence is legally and factually insufficient to support the trial court's finding that termination of Father's parental rights is in the child's best interest. We affirm in part and reverse and remand in part.

## BACKGROUND

Adam was born in Honduras in 2013. On December 5, 2020, when Adam was almost eight years old, the Department received a referral alleging sexual abuse of Adam by David Calderon. The referral also alleged as follows:

> [T]he child was alleged to have been smuggled to the United States from Honduras also by Mr. Calderon. There are also allegations of physical abuse by Mr. Calderon and medical neglect. The child has been in three different homes since arriving to the United States. One being that of David Calderon, one being that of [Ms.] Portillo, and one being that of [Ms.] Manzanares. It is unknown how long [Adam] was in the care of Mr. Calderon. He was alleged to be with Ms. Portillo for approximately 22 days, and with Ms. Manzanares for approximately three days. Ms. Portillo allegedly received [Adam] from Mr. Calderon, who was supposed to be giving her money to keep [Adam]. Ms. Portillo met Ms. Manzanares at her church. Ms. Manzanares was called by Mr. Caldron and threatened to take [Adam] from Ms. Portillo, stating that another woman will be calling to meet her with the other kids and that she needs to appear with [Adam] at that time. Ms. Manzanares and her adult son reported this to the police and turned over [Adam] at that time to Child Protective Services.

On December 8, 2020, the Department filed its Original Petition for Protection of a Child for Conservatorship, and for Termination in a Suit Affecting the Parent-

Child Relationship. That same day, the trial court signed an Order for Protection of a Child in an Emergency, appointing the Department as emergency temporary sole managing conservator of the child. Adam was placed in a foster home.

On November 29, 2021, Mother and Father filed a Joint Counter-Petition in Suit Affecting the Parent-Child Relationship and Request for Temporary Orders, pleading for a return of the child to his parents.

The trial judge conducted a bench trial over three days, December 7, 2021, January 26, 2022 and February 25, 2022. Mother and Father appeared via WhatsApp with a certified Spanish interpreter; they were represented by their respective attorneys. The court heard testimony from the caseworker, Cali Crawford; the foster mother, C. Tanner; the supervisor, Yolanda Jenkins; another foster mother, D. Winger; the investigator, Karla Rodas; a cousin of Adam, Belki Hernandez; and Mother and Father.

On May 4, 2022, the trial court signed a "Final Decree for Termination." The court found that termination of Mother's and Father's parental rights was in the child's best interest and was justified under several subsections of section 161.001(b)(1) of the Texas Family Code. Mother's parental rights were terminated pursuant to section 161.001(b)(1) (D) and (E) of the Texas Family Code. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Father's parental rights were terminated pursuant to section 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code. *See id*. § 161.001(b)(1)(D), (E), (N), (O). The trial court appointed the Department to be the child's sole managing conservator. Mother and Father timely appealed.

## ANALYSIS

Mother presents four issues on appeal, arguing that the (1) evidence is legally and factually insufficient to support termination of her parental rights pursuant to

Texas Family Code section 161.001(b)(1) (D) and (E); (2) evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the child's best interest; and (3) trial court abused its discretion when it appointed the Department to be the sole managing conservator of the child because the evidence is insufficient to support the appointment. Father presents five issues on appeal, contending that the (1) trial court lacked jurisdiction "to sign a decree terminating the parental rights of" Father; (2) evidence is legally and factually insufficient to support termination of his parental rights pursuant to Texas Family Code section 161.001(b)(1) (D), (E), (N), and (O); and (3) evidence is legally and factually insufficient to support the trial court's finding that termination of Father's parental rights is in the child's best interest.

## I.    Jurisdiction

Considering that Mother and Father are foreign nationals living in their home country of Honduras and Adam is an undocumented foreign national from Honduras, we first address subject matter jurisdiction before turning to the parties' arguments on the merits.

"'A court may exercise only the jurisdiction accorded it by the constitution or by statute.'" *Estate of Nicholas*, No. 14-19-00716-CV, 2020 WL 1469519, at *4 (Tex. App.—Houston [14th Dist.] Mar. 26, 2020, pet. denied) (quoting *Goodman v. Summit at W. Rim, Ltd.*, 952 S.W.2d 930, 933 (Tex. App.—Austin 1997, no pet.)); *Vantage Sys. Design, Inc. v. Raymondville Indep. Sch. Dist.*, 290 S.W.3d 312, 317–18 (Tex. App.—Corpus Christi 2009, pet. denied) (subject matter jurisdiction is authorized by constitution or statute); *Webb v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, No. 03-03-00764-CV, 2005 WL 3234580, at *2 (Tex. App.—Austin Dec. 2, 2005, no pet.) (mem. op.) (subject matter jurisdiction refers to the kind of controversies a court has authority to hear—authority conferred by constitution or statutes).

Subject matter jurisdiction is never presumed, cannot be conferred by consent or estoppel, and cannot be waived. *See Wilmer-Hutchins Indep. Sch. Dist. v. Sullivan*, 51 S.W.3d 293, 294 (Tex. 2001) (per curiam); *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000); *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443-44 (Tex. 1993). Even if not raised, issues affecting jurisdiction must be reviewed *sua sponte*. *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004) (per curiam); *Gantt v. Gantt*, 208 S.W.3d 27, 30 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

In his first issue, "Father challenges whether the trial court maintained subject matter jurisdiction, which granted authority to sign a decree terminating the parental rights of the appellant, a foreign national living in his home country of Honduras, and the child is an undocumented foreign national from Honduras." In that regard, Father "asserts the trial court should have allowed the federal authorities to hear this dispute as (1) the issues involved require the special competence of the agency, and (2) great benefit is derived from the agency's uniform interpretation of its laws and regulations." He also states: "Appellant argues DINAF was the appropriate governmental agency, which the appellant believed which could provide a remedy." Mother had filed an action with DINAF (Direccion de Niñez Adolescencia y Familia) in Honduras.

However, Father does not cite any applicable authorities nor does he present a clear and concise argument for his assertions as required by Texas Rule of Appellate Procedure 38.1(i) (requiring that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). *See* Tex. R. App. P. 38.1(i). Nonetheless, as we explain below, we conclude that the trial court had jurisdiction in this case.

A district court's statutory authority for subject matter jurisdiction over suits involving child custody is found in the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), as incorporated in the Texas Family Code. *See* Tex. Fam. Code Ann. §§ 102.011, 152.201; *Arteaga v. Tex. Dep't of Protective & Regul. Servs.*, 924 S.W.2d 756, 759 (Tex. App.—Austin 1996, writ denied). The UCCJEA applies to a suit by the State to terminate parental rights. *See* Tex. Fam. Code Ann. § 152.102(4) ("Child custody proceeding" includes a proceeding for termination of parental rights.); *Arteaga*, 924 S.W.2d at 760.

As relevant here, section 102.011(a) ("Acquiring Jurisdiction over Nonresident") provides: "The court may exercise status or subject matter jurisdiction over the suit as provided by Chapter 152." *See* Tex. Fam. Code Ann. § 102.011(a). Further, section 152.201(a)(1) ("Initial Child Custody Jurisdiction") provides, as applicable here, that a Texas court has jurisdiction to make an initial custody determination if "this state is the home state of the child on the date of the commencement of the proceeding." *See* Tex. Fam. Code Ann. § 152.201(a)(1).

Thus, the UCCJEA confers jurisdiction to Texas courts if Texas is the child's home state at the time the suit is filed. *See* Tex. Fam. Code Ann. § 152.201(a)(1); *Arteaga*, 924 S.W.2d at 760. The statute defines the child's home state as the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of the termination of parental rights proceeding. *See* Tex. Fam. Code Ann. § 152.102(7); *Arteaga*, 924 S.W.2d at 760.

The Department filed its Original Petition for Protection of a Child for Conservatorship, and for Termination in a Suit Affecting the Parent-Child Relationship on December 8, 2020, asserting that the trial court has home state jurisdiction and that no other court has continuing, exclusive jurisdiction over the

6

child. The court held a full adversary hearing on December 29, 2020, at which the parents appeared via phone with their respective counsel. After hearing evidence and argument of counsel, the trial court stated in its order that, based on the evidence presented, it "finds that all necessary prerequisites of the law have been satisfied and that this Court has jurisdiction of this case and of all the parties." Both Father and Mother appeared in the Texas courts without filing a plea to the jurisdiction or a special appearance. They affirmatively asked the Texas courts to return Adam to them.

Further, during the bench trial proceedings, evidence revealed that after Adam travelled with Calderon from Honduras to the United States in June 2019, Calderon took Adam to stay with Belki Hernandez (a relative of Adam) in Houston for six months from June to December 2019. Calderon then forcibly took Adam from Belki's house. Thereafter, Adam stayed with Calderon (and only shortly with babysitters Portillo and Manzanares) in Houston. The parties do not dispute the evidence or the trial court's finding that Texas was Adam's home state six months before the Department commenced the termination of parental rights proceeding. The trial court thus properly exercised subject matter jurisdiction over Adam's termination proceeding. We recognize that Adam's parents are foreign nationals who are still living in Honduras. However, we note that the UCCJEA also applies to international disputes. *See* Tex. Fam. Code Ann. § 152.105(a) ("International Application of Chapter"; "A court of this state shall treat a foreign country as if it were a state of the United States for the purpose of applying this subchapter and Subchapter C"); *Arteaga*, 924 S.W.2d at 760.

The dissent argues that the court does not have jurisdiction because no one was acting as a parent for Adam. This was true at the time of the emergency removal but after being in the Department's care for six months the statutory requirements

have now been met. *See In the Interest of F.M.-T*, No. 02-13-00230-CV, 2013 WL 5517915, at * 2–3 (Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.). The dissent does not discuss what would now happen to Adam under its holding. Is he under a permanent emergency order? What should the Department do with Adam?

We overrule Father's first issue.

## II.    Predicate Grounds for Termination

Mother argues in her first and second issues that the evidence is legally and factually insufficient to support termination of her parental rights pursuant to Texas Family Code section 161.001(b)(1) (D) and (E). Father argues in his second, third, and fourth issues that the evidence is legally and factually insufficient to support termination of his parental rights pursuant to Texas Family Code section 161.001(b)(1) (D), (E), (N), and (O).

### A.    Standard of Review and Burden of Proof

Due to the severity and permanency of the termination of parental rights, the law imposes a heightened burden of proof, requiring clear and convincing evidence. *In re L.E.R.*, 650 S.W.3d 771, 782 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *see also* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). This heightened standard of review is mandated not only by the Family Code but also by the Due Process Clause of the United States Constitution. *In re E.N.C.*, 384 S.W.3d at 802. The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

This heightened burden of proof results in heightened standards of review for evidentiary sufficiency. *In re L.E.R.*, 650 S.W.3d at 782; *In re V.A.*, 598 S.W.3d 317,

327 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). For a legal sufficiency challenge, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all controverting evidence a reasonable factfinder could disbelieve. *Id.*

For a factual sufficiency challenge, we consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable factfinder could have formed a firm belief or conviction that its finding was true. *In re L.E.R.*, 650 S.W.3d at 782; *see also In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.'" *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d at 266).

### B.     Predicate Findings under Section 161.001(b)(1)(D) and (E)

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(b)(1); and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re M.P.*, 639 S.W.3d 700, 701-02 (Tex. 2022) (per curiam). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest. *In re M.P.*, 639 S.W.3d at 702; *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

Here, the trial court made predicate termination findings pursuant to Texas Family Code section 161.001(b)(1)(D) and (E), and Mother and Father challenge the

9

legal and factual sufficiency of the evidence to support the trial court's findings on these predicate grounds.

## 1. Applicable Law

Termination under subsection (D) requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Termination under subsection (E) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(b)(1)(E). In these contexts, "endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health."). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it is not necessary that the conduct was directed at the child or that the child actually suffered injury. *In re M.C.*, 917 S.W.2d at 269; *In re L.E.R.*, 650 S.W.3d at 783.

Subsections (D) and (E) differ with respect to the source of the danger to the child. Endangerment under (D) focuses on evidence related to the child's environment, *i.e.*, the acceptability and suitability of living conditions rather than parental conduct in the home, though parental conduct is certainly relevant to the child's environment. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re S.R.*, 452 S.W.3d at 360

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result

of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360. Unlike subsection (D), termination under subsection (E) must be supported by evidence of a voluntary, deliberate, and conscious course of conduct by the parent and not a single act or omission. *Id.*

In evaluating endangerment under subsection (D), courts consider the child's environment before the Department obtained custody of the child. *See In re L.E.R.*, 650 S.W.3d at 784; *In re C.W.M.P.*, No. 14-20-00571-CV, 2021 WL 244865, at *6 (Tex. App.—Houston [14th Dist.] Jan. 26, 2021, pet. denied) (mem. op.). Under subsection (E), however, courts may consider conduct before and after the Department removed the child from the home. *In re C.W.M.P.*, 2021 WL 244865, at *6; *In re S.R.*, 452 S.W.3d at 360.

### 2. Termination of Mother's and Father's Parental Rights under Section 161.001(b)(1)(D) and (E)

We begin by addressing Mother's first issue, and Father's second issue in which they challenge the legal sufficiency of the evidence to support the trial court's predicate findings under section 161.001(b)(1)(D) and (E). Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.

Evidence showed that Mother and Father allowed their six-year-old son to travel with Calderon from Honduras to the United States to enter the country illegally. By doing so, Mother engaged in conduct and placed her son in conditions that endangered his physical and emotional well-being. Although it was Father who made the agreement with Calderon and Mother stated that she did not want Adam or any of her children to travel with Calderon, Mother nonetheless testified that she "agreed to allow [her] child to be taken by Mr. Calderon to the United States." At the time Mother and Father allowed Adam to travel with Calderon on a 14-day

11

journey with a coyote—i.e., a human smuggler—Adam was only six years old, was very small for his age, usually ate very little because he only liked certain foods, had had pneumonia eight times, had to be hospitalized three times, and had speech problems.

Although Mother testified that she did not think Adam would be "at risk" or "in danger" with Calderon during the journey, she also testified that she "thought it was dangerous" for Adam to go with Calderon to the United States. Father testified he "didn't know that it could be dangerous for a child to try to enter the United States illegally," Father acknowledged that he is not "clueless about any possible dangers a person can possibly face trying to enter the United States illegally." Both parents acknowledged there was no opportunity to talk to Adam during the journey, and they could only communicate with the coyote. They also acknowledged that they did not pack any clothing for her son to take on the journey but relied on Calderon to provide for Adam. Letting their son travel to the United States also subjected Adam to a life of uncertainty and instability and thereby endangered his physical and emotional well-being.

Additionally, there is evidence that once Adam and Calderon were in the United States, Mother and Father allowed Adam to stay in an environment that endangered Adam's physical and emotional well-being. Belki testified that she was concerned about Adam's "dental needs" and asked Mother to send her documents so she could take the child to the dentist and also enroll him in school. But although Mother testified that she sent documents to Belki, Belki stated that she never received a birth certificate or other papers for Adam during the time he lived with her. Adam's medical needs were not addressed and met.

Further, Mother and Father allowed their son to remain in Calderon's care even though they knew he was abusing Adam. Mother told the foster mother,

12

Tanner, that she knew Calderon mistreated her son. Mother told the investigator, Rodas, that Adam had complained about being mistreated by Calderon and "being locked in the closet in the dark." Mother also told Rodas that Adam complained about staying at Devar's house (Calderon's sister in law) and that Devar's children sometimes placed roaches on Adam's plate. Calderon stayed with Adam at Devar's house for over a year before moving to another apartment.

Considering the evidence in the light most favorable to the trial court's ruling, we conclude the trial court could have formed a firm belief or conviction that Mother and Father (1) knowingly placed and allowed Adam to remain in conditions or surroundings which endangered his physical or emotional well-being, and (2) engaged in conduct or knowingly placed Adam with persons who engaged in conduct which endangered Adam's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Because we determine that there is legally sufficient evidence to support the trial court's finding of endangerment under subsection (D) and (E), we overrule Mother's first issue and Father's second issue.[2]

---

[2] Due to our disposition below, we need not address Mother's second issue in which she contends that the evidence is factually insufficient to support the trial court's endangerment finding under section 161.001(b)(1)(D) and (E). This is so because, even were we to sustain Mother's factual sufficiency challenge raised in her second issue, Mother would not be granted any more relief than we have afforded her below. *See In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *17 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet. h.) (mem. op. on reh'g); *In re M.A.J.*, 612 S.W.3d 398, 408-09 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

Having held that the evidence is legally sufficient to support the trial court's finding of endangerment under subsection (D) and (E), we need not address the portions of Father's third and fourth issues in which he asserts that the evidence is legally insufficient to support the trial court's finding that he constructively abandoned Adam and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain Adam's return. *See id.* § 161.001(b)(1)(N), (O); *In re M.P.*, 639 S.W.3d at 702; *In re A.V.*, 113 S.W.3d at 362 (Only one predicate finding under section

## III. Best Interest Finding

Mother complains in her third issue and the Father in his fifth that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the child's best interest.

### A. Applicable Law

The purpose of the Department's intervention in the parent-child relationship is to protect the best interest of the child, not to punish parents for their conduct. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003); *In re F.M.E.A.F.*, 572 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). "There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship." *In re F.M.E.A.F.*, 572 S.W.3d at 726. Therefore, we strictly scrutinize termination proceedings in favor of the parent. *In re T.S.*, 2022 WL 4474277, at *18.

"Termination of parental rights should not be used as a mechanism to merely reallocate children to better and more prosperous parents." *In re M.A.J.*, 612 S.W.3d at 409. Furthermore, "termination is not warranted 'without the most solid and

---

161.001(b)(1) is necessary to support a judgment of termination when there also is a finding that termination is in the child's best interest.).

Due to our disposition below, we need not address that part of Father's second issue in which he contends that the evidence is factually insufficient to support the trial court's endangerment finding under section 161.001(b)(1)(D) and (E). We also need not address the portions of Father's third and fourth issues in which he contends that the evidence is factually insufficient to support the trial court's finding that he constructively abandoned Adam and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain Adam's return. This is so because, even were we to sustain his factual sufficiency challenge raised in these issues, Father would not be granted any more relief than we have afforded him below. *See In re T.S.*, 2022 WL 4474277, at *17; *In re M.A.J.*, 612 S.W.3d at 408-09.

14

substantial reasons.'" *Id.* (quoting *Wiley v. Spratlan*, 543 S.W.2d 349 (Tex. 1976)). The Department's burden is not merely to prove that a parent should not have custody of his or her child; instead, the Department must prove by clear and convincing evidence that the parent should no longer have any relationship with his or her child. *In re T.S.*, 2022 WL 4474277, at *18; *In re M.A.J.*, 612 S.W.3d at 409.

In determining whether the evidence is sufficient to prove that termination is in the child's best interest, courts may consider several non-exclusive factors known as the *Holley* factors: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

Likewise, "[p]roof of acts or omissions providing grounds for termination under section 161.001(b)(1) does not relieve the petitioner from proving the best-interest element, but the same evidence may be probative of both." *In re A.C.*, 560 S.W.3d 624, 631-32 (Tex. 2018); *see also In re C.H.*, 89 S.W.3d at 28. The best interest analysis is "child-centered and focuses on the child's well-being, safety, and development." *In re A.C.*, 560 S.W.3d at 631. A child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best interest determination. *In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

**B.      Best Interest Finding Regarding Mother and Father**

We now consider the multiple factors to determine whether the evidence in the record supports the trial court's finding that termination of Mother's and Father's parental rights was in the child's best interest.

*1.      Child's Desires*

At the time of trial, Adam was nine years old. Adam did not testify at trial and no evidence was presented indicating Adam desired the termination of his relationship with Mother and Father or that he even knew the implications of never having a relationship with his parents again.

*2.      Present or Future Emotional or Physical Needs and Present or Future Emotional or Physical Danger*

The Department did not present any evidence that Mother's or Father's home was unsatisfactory at the time of trial. Crawford, the caseworker, testified that, in October 2021, she sent an email to "the U.S. Consulate and the Honduras Consulate to open up a case about . . . possibly doing a home study in Honduras." But Crawford admitted never sending a follow-up email because she did not think it was important and because she "asked Mother to follow up with that as we do not do any dealings with the consulate and it was just only an effort for us to reach out to them to let them know there was a case here in the United States."

The Department never inquired about the well-being of Adam's siblings and how Father or Mother provided for their other children or for Adam while he was living at home. However, Belki testified that she observed the parents' relationship with Adam while she stayed with the parents in Honduras. She stated that she observed the parents with the child and described how well both parents cared for Adam. Belki never thought the parents ever tried to put Adam in harm's way or endanger him. She had no concerns about the child's development or physical

16

condition while he was at his parents' home, and she thought the child was doing well and needed no medical attention.

Mother testified that Adam has always been small for his age but explained that Adam was born prematurely at seven months along and was placed in an incubator because he had pneumonia. Mother stayed with Adam in the hospital for a month after his birth. She testified that she and Father had taken Adam three times to the hospital for pneumonia and five times to the health center, showing that Mother has been able to get her son medical care when he lived with her at home. Mother also stated that Adam was doing well and ate when he was at home, although she noted that there "was very little that he would eat" and the "reason was because there was some food that he liked and others that he did not like." With respect to Adam's education, Mother had a teacher come to her house because Adam "was very small and he could not go to the school," and it was very expensive "to take him to kinder."

Father testified that he and Mother have two other children, a son and a daughter who are both younger than Adam. According to Father, only his daughter would get pneumonia just as Adam did when he still lived at home. Father stated he got his daughter medical care when she was sick and stated that he could get his children medical attention at the hospital if they were sick. Father stated that if the court were to return Adam home, Father "could provide a safe and stable environment to meet his physical and emotional needs." He stated he has been taking care of his family with the money he has been earning, Adam was never without food when he was at home, and Mother is capable of caring for Adam and his two siblings.

The Department argues that "the parental misconduct that endangered this child in the past may recur in the future," intimating that because Mother and Father

17

allowed Adam to be taken by Calderon to the United States, they again might allow someone to take their son to facilitate an easier border crossing. In that regard, Crawford testified that she had asked Mother "what would she do if someone was to come and take her kid again and she didn't have much of a response." However, we do not know what Mother's exact response to Crawford's question was and whether it was just Crawford's subjective judgment that Mother "didn't have much of a response." Mother testified that if Adam were returned to her, she would be able "to keep him safe."

Further, evidence shows that although Mother allowed Adam to travel with Calderon, she did not just hand over her son. There is testimony that she fought the man who came to take Adam, but the man mistreated her. Mother also denied allowing Calderon to take Adam to the United States. She made clear that she did not agree with her husband that Calderon could take the child to the United States, but that her husband "was in agreement [with Calderon] because it was his cousin and that's why he trusted him." Although Mother responded that she "agreed to allow [her] child to be taken by" Calderon, she also stated that Father would have given Calderon another child if Adam had not gone. Mother stated she did not want any of her children to go with Calderon. Additionally, evidence shows that Adam was not taken from his home until Father actually made an agreement with Calderon. Both parents testified they would provide a safe environment for their son.

Evidence showed that Father only agreed to let Adam travel with Calderon because Father trusted his cousin and his cousin kept persistently coming to the house. Father also testified that he believed Calderon would keep Adam safe and provide for Adam's food, clothing, and shelter during travel. And the agreement was for Calderon to send Adam back once Calderon arrived at his brother's place in the

18

United States. Father testified that he asked Calderon to return Adam home to Honduras but Calderon refused.

We are also mindful of the fact that Mother and Father allowed their son to remain with Calderon despite knowing that Calderon had mistreated their son. But there is also evidence that Mother had no means to return her son home and that she pleaded with Calderon to bring her child back home as he had promised. She stated that Calderon "would mock me — he would mock me about him returning the child." To get her son back, Mother stated she travelled two hours by bus with her other two children to DINAF. She travelled in February, September, and November 2020, but DINAF was closed. In March 2021, DINAF was open and she filed a "Return Request" requesting help to bring her son back to Honduras. She also claimed that Calderon threatened her when she asked him to send her son home to Honduras. According to Mother, Calderon would tell her that he has friends in the police and would send them to her house. When Mother told Calderon that she would call the police, "he said he was not scared of police because police would do nothing to him."

With regard to Adam's needs, the Department seems to contend that Adam's medical and academic needs can only be met here and cannot be met in Honduras, but there is no evidence to support such an assertion. Also, it is somewhat unclear what specifically Adam's current and future needs are. Any acute dental problems seem to have been resolved while Adam was with Tanner between July and October 2021; and at the time of trial, Adam only needed to see the dentist again because one of his spacers fell out. The Department did not present any evidence regarding what other dental care, if any, Adam needed that could not be provided in Honduras.

Further, Tanner testified she thought that Adam's medical needs were "mostly related to his development." The previous foster parent left Tanner "notes they were investigating genetic disorders because he is small for his age, but that was on hold

19

because he was in so many transitions, so they were going to draw many labs to figure that out." Although Tanner stated that she was a school and pediatric nurse, Adam was not in a therapeutic foster placement with her but was in her "home in transition" because the Department was waiting for an opening for a therapy placement. While Adam was with Tanner, he was evaluated at school and diagnosed with "an intellectual disability with an IQ of 36 and a speech impediment." Adam did not speak much when he arrived at Tanner's home and had not received speech therapy yet. He began speech therapy at school but that "was very little." We note that by the time Adam was placed in Tanner's home, he had been in the Department's care for over seven months without any concrete medical diagnosis and attention.

When asked to describe Adam's "current medical issues," his current foster mother Winger responded that she "took him to the pediatrician and he was severely malnourished, so [the pediatrician] put him on PediaSure and then she referred us to a geneticist, endocrinologist and a gastroenterologist." We note that Adam had been nearly 10 months in the Department's care before being referred to specialists and given PediaSure because he was "severely malnourished." Winger testified that Adam's DNA results revealed that his parents were related, and "this might be why [Adam] has some of the issues he has." The geneticist sent out more DNA for testing to determine if Adam has an intellectual disability and why he is not thriving. At the time of trial, no definite results were presented. Winger also stated that a gastroenterologist treated Adam after tests revealed he had H. pylori bacteria in his intestine.

Winger testified that Adam has speech therapy at school and currently has no behavior issues because "he's able to verbalize his wants and needs and he doesn't have to resort to throwing a tantrum or being aggressive, hitting, because no one

understands what he's saying." Winger testified that Adam "had an English speaking teacher and English speaking aides, and was having a hard time. He was having meltdowns and he couldn't communicate"; now he has a bilingual teacher and is in a bilingual class.

Caseworker Crawford also testified regarding the child's needs, stating that Adam has a problem with bedwetting and is on medication for ADHD and PTSD and has been seeing a psychiatrist every three months since he came into the Department's care "to address the PTSD and triggers." Although Adam has "completed the geneticist and the gastrologist appointments," she confirmed Adam would not see an endocrinologist until several months after the completion of trial some time in April 2022 and over 16 months after Adam came into the Department's care. Crawford testified that the child has a speech impediment and started working with a therapist once a week.

Crawford testified that the child also "has a therapist that comes onto the campus that speaks with him for his academics," but it is unclear what the therapist's specific role is. She testified that Adam had an ARD meeting in November 2021, after which he was moved to a different school to receive necessary services and accommodations, including having a "bilingual interventionist to translate," having more time to learn a concept and do an activity, having directions read out loud, and working with a speech pathologist once a week. Crawford testified that Adam has "currently failing" grades, but he is improving. "[H]e still struggles with writing his name and recognizing the alphabet."

No evidence was presented regarding whether there is any correlation between Adam's academic struggles and his diagnosis with "an intellectual disability with an IQ of 36" or what his academic future will likely be with or without accommodations. Additionally, there was no testimony that Adam could not receive

the same accommodations at home in Honduras minus a bilingual teacher, of course, because he would be learning and communicating in his native tongue and would not need one. Although the court broadly inquired whether Crawford had asked Mother "if these services, medical, academic, could be provided to [Adam] if he were back in Honduras with" his parents, Crawford replied that Mother had "stated that some of these things are not available in the country. And she also lives in a mountain area where things are quite far from her home." Crawford did not specify what "things" in particular were not available; nor did the Department question Mother at trial about what accommodations, doctors, therapists, medications etc. were available or unavailable. The fact that Mother lives in a mountainous area is not evidence of the child not being able to get the medical, academic, or emotional assistance he needs. Mother has taken her son to the doctor and hospital when he needed care and got him a teacher to come to her home. Mother also testified that she already found an endocrinologist in Honduras (albeit three hours away from her home) whom Adam can see to receive medical care.

Of importance is also Crawford's response when asked by the trial court what Adam's genetic condition is and "is there a treatment for that that he's undergoing right now":

> Currently, he is born with an extra chromosome. He's not missing any chromosomes that is in regards to as far as disability, but he has an extra chromosome indicating that Mom and Dad are related. . . . There is no treatment at this time as he is born with that chromosome and is part of his DNA, there's no treatment to alter that, but it is recommended for therapy as it may contribute to developmental delays. So there's — as far as therapy, speech therapy, getting his accommodations in school, keeping up with doctor visits and also keeping up with the monitoring of his growth.

According to Crawford, Adam will need more therapy and medical care in the future, but there is no treatment for his condition. In addition to the lack of evidence

regarding what necessary care the child would not be able to receive in Honduras, there also was no evidence presented that Mother could not satisfy her son's emotional needs with her love and care. Belki testified that whenever Mother called Adam, he "would like to see her and he would smile and he would laugh . . and would only look at her and he would say how are you." Belki testified that Mother would "say how much she missed him and make him laugh." There also was no evidence presented that Father could not satisfy his son's emotional needs with his love and care. Belki testified that she observed how well Father cared for and communicated with his son at home, and how "very endearing" he was with him. The Department did not present evidence establishing that Mother and Father would be unable to meet their son's current and future needs.

### 3. *Parental Abilities and Available Programs*

The Department attacks Mother's and Father's parental abilities claiming (1) "the evidence is undisputed the parents never took action to provide for" their son's "basic or special needs while he was in the U.S.", (2) Mother failed to send Belki documents so Belki could take Adam to the dentist and enroll him in school, and (3) Crawford stated that Mother "didn't have much of a response" when Mother was asked what she would do if someone tried to take her child again. However, as noted above, we do not know what Mother's exact response to Crawford's question was and whether it was just Crawford's subjective opinion that Mother "didn't have much of a response." Also, Father testified that he would have sent money for Adam's care if he had the money to do so. And Mother testified that she did not send money for her son because Calderon "said he was going to be in charge of the expenses of the child." Although Belki testified that she did not receive any documents while Adam lived with her, Mother claimed that she had sent Adam's documents.

No evidence was presented at trial that Mother negligently supervised Adam, acted aggressively or inappropriately toward him, or abused him in any way. Tanner testified that Mother appropriately spoke to Adam on the phone while he was in Tanner's care. Belki also testified that during Mother's daily calls, Adam "would like to see her and he would smile and he would laugh . . and would only look at her and he would say how are you." Mother was never "inappropriate with the child" during those calls; she "would say that she missed him. She wanted the child to go to Honduras. She would say how much she missed him and make him laugh." Belki also testified that while she stayed with the parents in Honduras, she observed how well Mother cared for Adam, and Belki had no concerns about the child's development or physical condition while he was at his parents' home, and she thought the child was doing well.

The Department states that "there is no evidence of any program that could have addressed the problems resulting from the parents' negligence with respect to [Adam]" and "the parents never came to the U.S. to do any programs and never offered to do any program to address the situation or prevent the dangerous situation they allowed to occur to perpetuate in the future." However, it is unclear how the above statements by the Department present an argument showing that termination of Father's parental rights is in Adam's best interest.

First, if there is no evidence of available programs, then the lack thereof cannot be held against Father and Mother. Second, the Department points to no evidence that the parents legally could have come to the United States "to do any programs" but refused to do so. Without evidence that it was legally possible for the parents to enter the United States and participate in programs, the Department's statements do not support a best interest finding. Third, the Department does not point to any evidence, and we did not locate any in the record, to support its assertion

that the parents "never offered to do any program to address the situation or prevent the dangerous situation they allowed to occur to perpetuate in the future." Fourth, there is no evidence before us that the Department offered Father or Mother any programs or required them to attend any programs that would have assisted the parents in promoting the child's best interest.

Regarding parental abilities, the Department contends "the evidence is undisputed the parents never took action to provide for or help with [Adam]'s basic or special needs while he was in the U.S. and that neglect included after the child came in care." However, there is no evidence that Father or Mother knew of any special needs Adam had before coming into the Department's care. They only knew that Adam had issues with his teeth because Belki asked Mother to send Adam's documents so Belki could take him to the doctor; and Belki also wanted documents so she could enroll Adam in school. Mother testified that she had sent Belki Adam's documents "again" implying she had already sent them once but Belki had not received them. Also, Father testified that he would have sent money for Adam's care if he had the money to do so. Further, Father cannot be expected "to help with" Adam's "special needs" when the Department failed to inform Father or Mother of any special needs Adam has. Crawford admitted she never sent the parents any documents about Adam's education, genetic testing, dental work, or medical care.

Next, the Department claims that "unlike the parents, the Department took steps to determine and address this child's special needs. Namely, the child was put with a caregiver who assisted with the child's educational issues by hiring her own private party specialist to make sure [Adam] got accommodations to go to third grade. The caregiver worked with him 30 to 45 minutes after school with letters and getting used to a pencil/pen in his hand." But the Department's assertion is disingenuous considering that Adam was placed with this caregiver ten months after

25

being in the Department's care. Thus, Adam had been in the Department's care for over ten months before Winger hired an advocate to ensure Adam would get all the educational services he needed and then worked with him to learn the alphabet, numbers, and writing his name. It was not until November 2021 that Adam had an ARD meeting after which he was moved to a different school to receive all the necessary services and recommended accommodations. Accordingly, the Department did not address Adam's "special needs" related to his education for 11 months.

The Department also claims that it addressed Adam's "special needs" because "[f]or three months (7/21 to 10/21) the Department also had the child placed with Ms. Tanner who was a school nurse and pediatric nurse for about 17 years." Again, this claim is disingenuous because Tanner just happened to be a nurse. Tanner testified that although she was a school and pediatric nurse, Adam was not in a therapeutic placement with her; she noted that Adam was in her "home in transition" until there was an opening for a therapy placement. Tanner also testified that she was aware Adam had medical needs because the previous foster parent "left [Tanner] notes they were investigating genetic disorders because he is small for his age, but that was on hold because he was in so many transitions, so they were going to draw many labs to figure that out."

We also note that there is no evidence with whom Adam was placed from December 2020 to July 2021. What the evidence does show, however, is that (except for dental care) Adam started seeing specialists only after his placement with Winger in October 2021. Winger testified that she took Adam to the pediatrician and he was "severely malnourished", so the pediatrician put him on PediaSure and also referred him to a geneticist, an endocrinologist, and a gastroenterologist. Winger testified that Adam's DNA results revealed that his parents were related, but the geneticist "didn't

say to what degree." The geneticist sent out more DNA for testing to determine if Adam has an intellectual disability and why he is not thriving. Winger stated that the gastroenterologist treated Adam after tests revealed he had H. pylori bacteria in his intestine. Adam was not scheduled to see the endocrinologist until April 2022.

#### 4. *Plans for the Child and Stability of the Home or Proposed Placement*

The Department presented no evidence as to the condition, safety, or stability of the parents' home at the time of trial. There was no home study conducted on the parents' home in Honduras to determine whether it was unsatisfactory. Crawford testified that she sent an email to "the U.S. Consulate and the Honduras Consulate to open up a case about . . . possibly doing a home study in Honduras," but she never followed up on her initial email. Mother still lives with Father and their other two children in the same home; she takes care of the children and Father works to provide for the family's needs. Both parents testified they would provide a safe environment for Adam.

Regarding the plans for the child by the individuals or agency seeking custody, Mother testified that she wants her son returned home to Honduras. She testified that she has tried to get her son back since his arrival in the United States. She claimed she pleaded with Calderon to return her child and also traveled to DINAF four times to request help to bring her child back home. Once she found out her son was in the Department's care, she called Rodas and asked that her son be returned home. Although Mother agreed that Adam is happy and doing well and "that, as it stands, it is in the best interest [for him] to remain in the care of CPS," she never agreed that it was in Adam's best interest to terminate her parental rights. She never wavered wanting her son returned.

Evidence shows that Adam was in several transition homes and, at the time of trial, still was not in an adoptive placement. In fact, Adam is supposed to stay only one year in Winger's home under the Department's treatment foster care program. Winger explained that under that program "we take care of high acuity kids with lots of needs, whether behav[ioral] or medical, and then we try and figure out what's going on with them and put them on the right path so they can go to the[ir] forever home or back home with parents or — we try and keep them out of residential treatment centers." The Department had no concrete plans for Adam's adoption and there was no evidence presented how likely it would be to find a "forever home" for him. Crawford confirmed that the Department has not identified anyone "to adopt this child."

5. *Acts or Omissions by the Parent and Excuse for Parent's Acts or Omissions*

Because the parents live in Honduras, the trial court did not require them to comply with a typical service plan. Instead, the court ordered them to maintain contact with the Department and their son, stating: "SERVICES REQUIRED BY PARENTS LIMITED TO MAINTAINING CONTACT WITH CASEWORKER AND TO THE EXTENT POSSIBLE, MAINTAIN CONTACT WITH CHILD."

Tanner testified that there was only one phone call with Mother during the time Adam was in Tanner's care. Tanner acknowledged that the caseworker had to set up visits with the Mother, and Mother was not allowed to freely call Tanner. Tanner stated that Adam's previous caseworker Wiltz had told her that he could not get ahold of Mother another time because "[Mother]'s in the wind." Tanner testified that Mother had indicated that she lived far away and had to go up a mountain to get good reception; Mother told Wiltz about the "spotty internet and her inability to call

28

in." Wiltz did not testify at trial, so there is no evidence regarding how often he tried to set up a call with Mother, so she could talk to her son.

Crawford testified that Mother maintained contact with her but not often, and contact with Mother is "maybe six to seven minutes." Crawford stated that, as of lately, her contact with Mother has been via text because Mother is "not getting reception in the area that she's currently residing in." Crawford acknowledged that Mother has appeared at previous court hearings. Crawford further stated that Mother "has visited with the child. It has not been consistent and lately it has not been happening for the last couple of weeks." She testified that Mother visited with Adam via WhatsApp and that either Crawford or the foster mother facilitated the visits.

Mother testified that she kept in contact with Adam since he left home. She testified she spoke to Adam every day while he was in Belki's care, and Belki confirmed that Mother had daily calls with her son. Once he left Belki's home, Mother spoke to Adam whenever Calderon allowed her to; she also had contact with Adam while he was with Portillo and maintained contact since Adam was placed in foster care. Mother testified that she had contact with her child every month since he came to the United States and she never felt that she had abandoned her child. Mother stated that the caseworker informed her that the Department required her to travel to DINAF and the United States Embassy to get her child back. She testified that she had traveled to DINAF, but she failed to make the 11-hour trip by bus with her other two children to the embassy. She claimed that she "came down with high fever," and that the caseworker offered her no alternative to going to the embassy.

Crawford testified that since she became Adam's caseworker in October 2021, Father had no contact with her or Adam. However, the Department presented no evidence establishing that Father failed to communicate with the Department or his son in the months before Crawford became the caseworker. Neither Adam nor Wiltz

29

testified at trial; and Crawford testified that she did not find "any notes of the prior caseworker communicating with the father." Crawford also claimed at trial that Father did not appear at "the previous hearings in this case" and that only Mother appeared. But Crawford's claim is contrary to the evidence. The record in fact shows that Father appeared at a hearing on December 29, 2020, February 3, 2021, and August 31, 2021; he only was unable to attend a May 18, 2021 hearing because he had to work.

Father is the sole breadwinner for his family. He testified that he has to travel hours each day to get to work. He also testified that he was able to communicate with Adam while he was in Belki's care and talked to Adam twice a week when he was living with Calderon. Although Father stated that he felt he abandoned Adam "since he's been in the care of CPS by not keeping in contact with him, " Father also stated he did not feel he abandoned Adam because he did not talk to Adam as often as he "possibly could while [Adam]'s been in care of CPS." Further, Father explained that he felt he did everything he could "to stay in his [son's] life by calling [his son] or speaking with [his] wife to know how [his] son is doing while he's been in the United States." Father also felt that Mother stayed in contact with Adam as best as she could.

We note that the Department's goal at the December 7, 2021 trial proceeding still was "family reunification or, alternatively, the adoption" of Adam. We can see no changes in circumstances between the December trial proceeding and the continued January 26, 2022 and February 25, 2022 proceedings that warranted the Department to change its goal from reunification to requesting only termination and concurrently the appointment of the Department as the permanent managing conservator.

Having reviewed the evidence in the record in the light most favorable to the trial court's finding, as we must when conducting a legal sufficiency review, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the best interest of the child. *See In re J.F.C.*, 96 S.W.3d at 266. However, after examining all the evidence, both favorable and contrary to the trial court's best interest finding, we conclude that a reasonable factfinder could not have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the best interest of the child. *See In re J.O.A.*, 283 S.W.3d at 345. Accordingly, we hold that the evidence is legally sufficient but factually insufficient to support the trial court's finding that termination of Mother's and Father's parental rights was in the child's best interest. We sustain Mother's third issue and Father's fifth issue with regard to their factual sufficiency challenge.

## IV. Conservatorship

In her fourth issue, Mother argues that the trial court abused its discretion by appointing the Department to be the sole managing conservator of the child because no evidence supports the appointment.

"[U]nless the court finds that appointment of the parent or parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development, a parent shall be appointed sole managing conservator or both parents shall be appointed as joint managing conservators of the child." Tex. Fam. Code Ann. § 153.131(a). The trial court made this finding, stating in its order that "appointment of a parent or both parents as managing conservator would not be in the best interest of the child, [Adam], because the appointment would significantly impair the child's physical health or emotional development." The court also found that appointing the

Department as sole managing conservator was in the child's best interest. This finding is governed by a preponderance of the evidence standard. Tex. Fam. Code Ann. § 105.005; *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007).

As the supreme court explained, "the quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment. Termination decisions must be supported by clear and convincing evidence. . . . On the other hand, a finding that appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by a preponderance-of-the-evidence standard." *In re J.A.J.*, 243 S.W.3d at 616.

Further, conservatorship determinations are subject to review only for abuse of discretion, and may be reversed only if the decision is arbitrary and unreasonable. *Id*. Because a different standard applies to conservatorship determinations, "evidentiary review that results in reversal of a termination order may not yield the same result for a conservatorship appointment." *Id*.; *see In re G.X.H.*, No. 14-19-00053-CV, 2022 WL 481773, at *10 (Tex. App.—Houston [14th Dist.] Feb. 17, 2022, no pet.) (mem. op.) (court upheld appointment of the Department as sole managing conservator of children, even though it determined there was legally sufficient evidence that termination of mother's parental rights was in the best interest of the children but not factually sufficient evidence).

A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *In re G.X.H.*, 2022 WL 481773, at *10. It is not an abuse of discretion for the trial court to base its decisions on conflicting evidence, so long as there is some evidence of substantive and probative character to support the trial court's decision. *Id*. Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds for asserting error, but are merely relevant

factors in assessing whether a trial court abused its discretion. *Id*. An abuse of discretion does not occur when the trial court bases its decision on conflicting evidence and some evidence of substantive and probative character supports its decision. *Id*.

As we in detail discussed and analyzed above, there was legally sufficient evidence to support the trial court's findings under section 161.001(b)(1)(D) and (E), and there also was legally sufficient evidence that termination of Mother's parental rights was in the best interest of the child based on the *Holley* factors, although the evidence was factually insufficient. Given the differing standards of proof and review between terminating parental rights and appointing a managing conservator, we cannot conclude that the trial court abused its discretion in naming the Department as sole managing conservator. *See In re J.A.J.*, 243 S.W.3d at 616; *In re G.X.H.*, 2022 WL 481773, at *10–11.

We overrule Mother's fourth issue.

## CONCLUSION

We reverse the portion of the trial court's Final Decree of Termination terminating Mother's and Father's parental rights to Adam and remand that portion of the case to the trial court for a new trial. *See* Tex. R. App. P. 28.4(c); *In re J.O.A.*, 283 S.W.3d at 347. We affirm the portion of the trial court's decree appointing the Department as Adam's sole managing conservator.[3]

---

[3] Father did not challenge the portion of the trial court's decree appointing the Department as Adam's sole managing conservator. *See In re J.A.J.*, 243 S.W.3d at 612–13.

33

/s/     Tracy Christopher
Chief Justice


Panel consists of Chief Justice Christopher and Justices Wise and Hassan. (Hassan, J., dissenting).